**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of JENNIFER JAN
BLEDSOE,

                            *Debtor.*

_____

MICHAEL B. BATLAN, Trustee,
                *Plaintiff-Appellant,*

                    v.

RYAN CURTIS BLEDSOE,
                *Defendant-Appellee.*

No. 07-35567

D.C. No.
CV-07-06062-HO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Argued and Submitted
December 9, 2008—Portland, Oregon

Filed June 25, 2009

Before: Diarmuid F. O'Scannlain, Susan P. Graber, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

7935

## COUNSEL

Peter C. McKittrick and Christopher L. Parnell, Farleigh Witt, Portland, Oregon, for the plaintiff-appellant.

David B. Mills, Hammons & Mills, Eugene, Oregon, for the defendant-appellee.

## OPINION

GRABER, Circuit Judge:

We must decide under what circumstances a federal bankruptcy court may avoid a transfer made pursuant to a state-court judgment dissolving the marriage of the debtor. We hold that, under Oregon law, a party who challenges a dissolution judgment must allege and prove "extrinsic fraud." Following the lead of the Fifth Circuit in *Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205 (5th Cir. 2003), we also hold that a dissolution judgment that follows from a regularly conducted, contested divorce proceeding conclusively establishes "rea-

sonably equivalent value" under 11 U.S.C. § 548(a)(1)(B) in
the absence of fraud, collusion, or violation of state law.

## FACTUAL AND PROCEDURAL HISTORY

Debtor Jennifer Jan Bledsoe and Defendant Ryan Curtis
Bledsoe married in 1994. Defendant filed for divorce in Ore-
gon state court in 2002. Debtor filed an appearance, and the
parties did not enter into a settlement.

In 2003, the Oregon court struck Debtor's appearance and
entered a default judgment. The court found that Debtor had
"failed to comply with the discovery and production require-
ments" of Oregon law; that she had "ignored the discovery
process and that her disobedience [was] willful and in bad
faith"; that she had "failed to comply with [one of] the
Court's order[s]"; and that she had "indicated no willingness,
despite repeated opportunity and while represented by a vari-
ety of counsel[,] to produce the documentation necessary for
a meaningful trial." According to Trustee Michael B. Batlan,
who is seeking to avoid the transfers made pursuant to the dis-
solution judgment, the state-court judgment granted Defen-
dant items valued at $93,737, while Debtor received items
valued at only $788.[1]

Debtor filed for bankruptcy in 2004. Thereafter, Trustee
brought an adversary action against Defendant, asserting
claims under 11 U.S.C. §§ 544(b)(1) and 548(a)(1)(B). The
bankruptcy court granted summary judgment to Defendant on
all claims, concluding:

---

[1]The dollar figures are those alleged by the Trustee. Defendant disputes
the allegedly inequitable distribution; he asserts that Debtor depleted the
marital assets during the dissolution proceedings and hid assets from him
and from the state court. Those factual disputes are not material to the
legal issues in this case. For purposes of this appeal, we assume without
deciding that Trustee's factual assertions are correct.

> Because [Trustee] does not allege any facts which may constitute "extrinsic fraud" under Oregon law, his claims under the Uniform Fraudulent Transfer Act constitute an impermissible collateral attack against the dissolution judgment entered by the state court and the state law claims [which underlie the § 544 claims] must therefore be dismissed. Because there are no allegations of collusion, actual intent to defraud, or that the dissolution judgment was not obtained pursuant to a regularly conducted proceeding under state law, the transfers made pursuant to the dissolution judgment conclusively establish reasonably equivalent value for purposes of Bankruptcy Code § 548(a)(1)(B).

The district court summarily affirmed, and Trustee timely appealed.

## STANDARDS OF REVIEW

We review de novo the district court's decision on appeal from a decision of the bankruptcy court. *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 810 (9th Cir. 2008). We review de novo the bankruptcy court's conclusions of law and review for clear error its findings of fact. *McDonald v. Checks-N-Advance, Inc. (In re Ferrell)*, 539 F.3d 1186, 1189 (9th Cir. 2008) (per curiam).

## DISCUSSION

Federal bankruptcy law, like state fraudulent transfer laws, generally allows a creditor to ask the court to void certain transfers if the creditor can establish either actual fraud or constructive fraud. An actual fraud theory alleges that the debtor transferred assets within a specified period before filing for bankruptcy and that the debtor did so with a fraudulent intent. Constructive fraud proceeds on the theory that, although the debtor may not have had a fraudulent intent, the

court nevertheless should void the transfer, usually because the debtor received inadequate consideration.

In this case, Trustee makes only a constructive fraud claim. That is, he does not argue that the dissolution judgment was obtained in order to thwart Debtor's creditors. He argues instead that the transfers pursuant to the dissolution judgment must be voided because Defendant received much more than Debtor.

**[1]** Under 11 U.S.C. § 544(b)(1), a trustee "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law." Here, Trustee argues that the transfers made under the dissolution judgment are voidable as fraudulent transfers under Oregon law, specifically its version of the Uniform Fraudulent Transfer Act ("UFTA"), Or. Rev. Stat. §§ 95.200-.310. *See Kupetz v. Wolf*, 845 F.2d 842, 845 (9th Cir. 1988) ("Section 544(b) of the Bankruptcy Code permits the Trustee to stand in the shoes of a creditor to assert any state law claims that a creditor may have."). Trustee also argues that the transfers made under the dissolution judgment are voidable directly under federal law, 11 U.S.C. § 548(a)(1)(B). Specifically, he asserts that, under § 548(a)(1)(B), Debtor "receive[d] less than a reasonably equivalent value" from the dissolution judgment. We will examine each claim in turn.

A.    *Section 544 Claim*

**[2]** In *Johnson v. Johnson*, 730 P.2d 1221, 1222 (Or. 1986), the Oregon Supreme Court held that a party may attack a judgment collaterally only by alleging and proving "extrinsic fraud." *See also id.* ("Since *Friese v. Hummel*, 37 P. 458 ([Or.] 1894) [(per curiam)], this court has recognized a distinction between extrinsic and intrinsic fraud in granting relief from a judgment."). "Extrinsic fraud consists of collateral acts not involved in the fact finder's consideration of the merits of the case." *Id.* Trustee concedes that he does not allege extrin-

sic fraud, and we are bound, of course, by *Johnson. See Ariz. Elec. Power Coop., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995) ("When interpreting state law, federal courts are bound by decisions of the state's highest court."). So, if the extrinsic fraud requirement in *Johnson* applies to collateral attacks in the form of fraudulent transfer claims under the UFTA, the bankruptcy court did not err in dismissing Trustee's claim under § 544.

We begin by observing that nothing in *Johnson* suggests that its rule is not one of general applicability; that is, nothing suggests that the rule would not apply to *all* collateral attacks on judgments. Additionally, Trustee has failed to explain persuasively why UFTA fraudulent transfer claims would be subject to a different rule. But we need not rest there, because we have guidance from the Oregon Court of Appeals.

**[3]** In *Greeninger v. Cromwell*, 915 P.2d 479, 481-82 (Or. Ct. App. 1996), the court considered a UFTA fraudulent transfer claim—identical to the one brought by Trustee here—and held that the extrinsic fraud requirement from *Johnson* applies. "In the absence of a pronouncement by the highest court of a state, we must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently." *Munson v. Del Taco, Inc.*, 522 F.3d 997, 1002 (9th Cir. 2008) (order) (alterations and internal quotation marks omitted). Trustee argues that *Greeninger* was wrongly decided, but there is little evidence—and certainly not "convincing evidence"—that the Oregon Supreme Court would repudiate *Greeninger*.

According to Trustee, the *Greeninger* court failed to appreciate the difference between UFTA fraudulent transfer claims and other collateral attacks. Trustee's argument begins with the unobjectionable observation that, generally speaking, a party may seek avoidance of transfers under either an actual fraud theory or a constructive fraud theory. According to

Trustee, the *Greeninger* rule eviscerates the second half of that proposition, because it disallows all claims under a constructive fraud theory.

**[4]** Trustee reads the *Greeninger* rule too broadly. A party may not proceed under a constructive fraud theory when challenging a state-court judgment collaterally, but constructive fraud is still a viable theory for challenging all other types of transfers. *See, e.g.*, Or. Rev. Stat. § 95.230(1)(b). Most constructive fraud cases do not involve transfers that have received a judicial imprimatur, and even fewer involve transfers effected through marriage dissolution judgments. With respect to the class of cases like this one, involving transfers under a regularly obtained dissolution judgment following a contested proceeding, we think that the Oregon Supreme Court would hold, as did *Greeninger*, that allegations of extrinsic fraud are required.[2]

---

[2]Trustee also relies on several cases that he urges support his position. None of the cases applies Oregon law, and each is otherwise inapposite or of no help to Trustee.

For example, *Britt v. Damson*, 334 F.2d 896 (9th Cir. 1964), contradicts Trustee's position. There, we rejected claims premised on Washington law and brought under the predecessor statute to § 544, because "[w]e [we]re not aware of any Washington decision in which it was held that creditors of a marital community which has been terminated by divorce may set aside a property award on the basis that it was a fraudulent transfer." *Id.* at 901.

Other cases involved a marital settlement agreement, rather than a dissolution judgment entered at the conclusion of a regularly conducted state-court proceeding. *See Beverly v. Wolkowitz (In re Beverly)*, 374 B.R. 221 (B.A.P. 9th Cir. 2007) (applying California law to a marital settlement agreement), *adopted*, 551 F.3d 1092 (9th Cir. 2008) (order); *Mejia v. Reed*, 74 P.3d 166, 174 (Cal. 2003) (same); *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707-09 (6th Cir. 1999) (applying Ohio law to a marital separation agreement); *Roosevelt v. Ray (In re Roosevelt)*, 176 B.R. 200 (B.A.P. 9th Cir. 1994) (applying California law to a marital settlement agreement). Because transfers under a settlement agreement may raise different issues in this context, we need not and do not decide whether *Greeninger* would apply to a marital settlement agreement. *See In re Lynch-Kirby*, 185 P.3d 494, 496 (Or. Ct. App. 2008) (applying the rule that a marital settlement agreement is treated as a contract, whose terms are governed by the parties' intent, not the court's).

**[5]** In conclusion, in *Johnson* the Oregon Supreme Court announced a rule of general applicability that a party must allege extrinsic fraud to bring a successful collateral challenge to a regularly obtained court judgment. In *Greeninger*, the Oregon Court of Appeals applied that general rule to the specific type of claim here: a fraudulent transfer claim under the UFTA. There is no convincing evidence that the Oregon Supreme Court would repudiate *Greeninger*. We therefore hold that the district court properly granted summary judgment to Defendant on the § 544 claim.

B.   *Section 548 Claim*

As we have explained, a trustee may avoid certain transfers if the debtor "received less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B)(I). Defendant argues, and the bankruptcy court agreed, that a dissolution judgment following a regularly conducted state-court proceeding conclusively establishes "reasonably equivalent value." For the following reasons, we also agree.

**[6]** In *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 533 (1994), the Supreme Court addressed "whether the consideration received from a noncollusive, real estate mortgage foreclosure sale conducted in conformance with applicable state law conclusively satisfies the Bankruptcy Code's requirement . . . [of] exchange for 'a reasonably equivalent value.' " The Court answered that question in the affirmative, but expressly limited its holding to "mortgage foreclosures of real estate." *Id.* at 537 n.3.

The Court first rejected, primarily for textual reasons, the conclusion of some appellate courts that the term "reasonably equivalent value" meant "fair market value." *Id.* at 536-40. The Court next sought to create its own definition of a reasonable price, but rejected that approach, too: "To specify a federal 'reasonable' foreclosure-sale price is to extend federal bankruptcy law well beyond the traditional field of fraudulent

transfers, into realms of policy where it has not ventured before." *Id.* at 540. The Court then reasoned that "[i]t is beyond question that an essential state interest is at issue here"; that "[t]o displace traditional state regulation in such a manner, the federal statutory purpose must be 'clear and manifest' "; and that, because no such clear purpose appears evident in the Bankruptcy Code, the term "reasonably equivalent value" means "the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." *Id.* at 544-45. The Court concluded:

> This conclusion does not render § 548(a)(2)[**3**] superfluous, since the "reasonably equivalent value" criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context. Indeed, § 548(a)(2) will even continue to be an exclusive means of invalidating some foreclosure sales. Although *collusive* foreclosure sales are likely subject to attack under § 548(a)(1), which authorizes the trustee to avoid transfers "made . . . with actual intent to hinder, delay, or defraud" creditors, that provision may not reach foreclosure sales that, while not intentionally fraudulent, nevertheless fail to comply with all governing state laws. Any irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law deprives the sale price of its conclusive force under § 548(a)(2)(A) . . . .

*Id.* at 545-46 (citation omitted).

   **[7]** Applying the principles of *BFP*, the Fifth Circuit held in *Erlewine* that, as a matter of law, the debtor received "rea-

---

**3**The statute's numbering has changed, but its substance remains materially the same.

sonably equivalent value" from a state-court dissolution judgment. "We cannot agree with the Trustee that the Debtor necessarily received less than reasonably equivalent value for her claims solely by virtue of the fact that the Debtor received less than half of the community property." *Erlewine*, 349 F.3d at 211-12. The Fifth Circuit summarized *BFP* and concluded that the Court there responded to some of the same concerns as "are present in this case, and they suggest that we should hesitate before we impute to Congress an intent to upset the finality of judgments in an area as central to state law as divorce decrees." *Id.* at 212. The court limited its holding to cases in which the state divorce proceeding "was fully litigated, without any suggestion of collusion, sandbagging, or indeed any irregularity." *Id.* at 212-13.

We agree with the Fifth Circuit. At the outset, we share the policy concern that it voiced: "The Trustee's argument, if adopted, would apparently subject every divorce decree to scrutiny in the bankruptcy court, so long as the divorce court divided the community property unequally." *Id.* at 212.

**[8]** Turning to *BFP*, we observe what animated the Court's decision: that foreclosure sales touch on traditional state interests. Although the Court clearly limited its holding to mortgage foreclosure sales, the same basic principle applies here. The state's traditional interest in the regulation of marriage and divorce is at least as powerful as its traditional interest in regulating sales of real property. *See, e.g., Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 905 n.5 (1986) (recognizing "the State's strong, traditional interest in setting the terms of and procedures for marriage and divorce"). Avoiding transfers made pursuant to a state-court dissolution judgment would seriously impinge on that traditional state interest. "To displace traditional state regulation in such a manner, the federal statutory purpose must be 'clear and manifest.' " *BFP*, 511 U.S. at 544 (citation omitted). We do not discern any congressional intention to allow collateral attacks on, or to inject uncertainty into, properly obtained state dissolution judg-

ments. And, just as "reasonably equivalent value" was an approximate term for purposes of foreclosure sales, so it is for purposes of transfers made under a dissolution judgment. As the bankruptcy court cogently explained:

> Oregon law requires an equitable distribution of the parties' assets in a marital dissolution. [Or. Rev. Stat. § 107.15(1)(f).] Like property that is subject to foreclosure, the economic value of the assets is questionable and difficult to ascertain, so long as it is subject to the competing claims of the parties in the divorce. The divorce resolves these matters, and furthers the state's interests by dividing property in a manner that gives due consideration to the economic interests of the parties and their dependants, given the circumstances of the case. This process should be deemed to provide reasonably equivalent value to the same extent that a foreclosure does.

In conclusion, we hold that a state court's dissolution judgment, following a regularly conducted contested proceeding, conclusively establishes "reasonably equivalent value" for the purpose of § 548, in the absence of actual fraud.

   **[9]** Trustee argues in the alternative that, even under that rule, his § 548 claim must proceed because the dissolution judgment at issue here was a default judgment. We disagree. A default judgment has "the same solemn character as [a] judgment[ ] entered after trial." *Watson v. State*, 694 P.2d 560, 562 (Or. Ct. App. 1985) (en banc). There being no "suggestion of collusion, sandbagging, or indeed any irregularity" in the dissolution proceedings, *Erlewine*, 349 F.3d at 212-13, we hold that the rule applies here. Accordingly, we affirm the grant of summary judgment to Defendant on the § 548 claim.

   The special concurrence would hold that a marriage dissolution judgment does not effect a "transfer," as that term is defined by the Bankruptcy Code. Concurrence at 7955-60.

But the special concurrence fails to explain how we may reach that argument. Defendant did not raise that argument before us, before the district court, or before the bankruptcy court. The argument is therefore waived. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived."); *Thacker v. FCC (In re Magnacom Wireless, LLC)*, 503 F.3d 984, 996 (9th Cir. 2007) ("The trustee failed to raise this argument before either the bankruptcy court or the district court. We, therefore, deem it waived."), *cert. denied*, 128 S. Ct. 2076 (2008). In fact, Defendant expressly declined to raise the argument before the district court, stating: "As for [P]laintiff's claim under 11 U.S.C. § 548, [D]efendant agrees that a transfer occurred with the entry of the dissolution judgment."

**[10]** The parties' position is not surprising. Although we are hesitant to address an issue without the benefit of any briefing from the parties, we do note our deep skepticism of the special concurrence's position. " 'What constitutes a transfer and when it is complete' is a matter of federal law." *Barnhill v. Johnson*, 503 U.S. 393, 397 (1992) (quoting *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369-70 (1945)). The text of the Bankruptcy Code states: "The term 'transfer' means [among other things] (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). We are concerned that the special concurrence "fails to take proper account of the Bankruptcy Code's definition of 'transfer,' which is *extremely* broad." *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir. 1996); *see also id.* (" 'The definition of transfer is as broad as possible.' " (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5813)).

**[11]** Notwithstanding the "*extremely* broad" federal definition of transfer, *id.*, we note that the terms " 'property' and

'interest in property' are creatures of state law," *Barnhill*, 503 U.S. at 398. We therefore must examine whether Oregon law defines the property rights of spouses in a manner consistent with the special concurrence's position. It does not. "[A] transfer of marital assets under a judgment of annulment or dissolution of marriage . . . shall be considered *a partitioning of jointly owned property*." Or. Rev. Stat. § 107.105(1)(f) (emphasis added). It is indisputable that the partitioning of jointly owned property effects a transfer of property interests between the two parties.

AFFIRMED.

---

O'SCANNLAIN, Circuit Judge, specially concurring in part and concurring in the result:

I concur in the judgment of the Court and agree entirely with the majority's cogent analysis and rejection of the bankruptcy trustee's claim under 11 U.S.C. § 544, which would avoid the effect of the marriage dissolution judgment. Although I share the view that the trustee's parallel claim under § 548 must also fail, the majority's analysis of that issue troubles me, particularly with respect to *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994). I interpret *BFP* to hold that real estate mortgage foreclosure sales pursuant to state law establish reasonably equivalent value as a statutory matter; I believe, however, that state dissolution judgments cannot fulfill such function. Rather, the latter merely establish the ownership, not value, of property as between two divorcing spouses. This perspective compels me to take a somewhat different approach on the § 548 issue and therefore I cannot concur in Part B of the majority's opinion.

I

Michael Batlan is the trustee of the bankruptcy estate of Jennifer Jan Bledsoe, who filed for Chapter 7 protection.

Before she filed, the now former Mrs. Bledsoe had divorced her husband, Ryan Bledsoe, in a contested proceeding. The appropriate Oregon court adjudicated the divorce; over time Jennifer stopped participating, and the court divided the marital assets between the two former spouses in a default judgment. According to Batlan, Ryan received far more under the marriage dissolution judgment than Jennifer did. As the trustee of Jennifer's Chapter 7 estate, Batlan has the right to avoid, or set aside, certain transfers that she made during and shortly before bankruptcy. *See* 11 U.S.C. §§ 544-49 (establishing and limiting the trustee's "avoidance powers"); *see also* 11 U.S.C. § 550 (establishing the liability of a transferee of an avoided transfer). Batlan seeks to avoid the effect of the marriage dissolution judgment as a fraudulent conveyance under two provisions of the Bankruptcy Code—§§ 544 and 548. Because I agree with the majority's discussion of the § 544 claim, I address only the § 548 claim.

II

A

Section 548 allows the trustee to avoid transfers, made on the eve of bankruptcy, because they are said to defraud creditors. The law governing so-called fraudulent conveyances has a long pedigree in the common law, and it has generally recognized two types of fraud. First, a transfer is fraudulent if made "with *actual intent* to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." § 548(a)(1)(A) (emphasis added). This is the classic fraudulent conveyance, as English law has recognized it since the Statute of 13 Elizabeth I. *See* An Act Against Fraudulent Deeds, Gifts, and Alienations, 1571, 13 Eliz. c. 5, s. 2 (nullifying as against third parties conveyances with the "Purpose and Intent to delaye hynder or defraude Creditors"), cited in *Donell v. Kowell*, 533 F.3d 762, 774 (9th Cir. 2008). To take an example, suppose a man owes $1000 to his credi-

tor, but before he files for bankruptcy, he secretly "sells" his mint-condition sports car to his brother for $500 in order to defraud his creditor—the classic, actually fraudulent transfer.

Second, transfers can be constructively fraudulent where courts infer fraudulent intent without direct evidence of it. These transfers bear one of the so-called "badges of fraud" traditionally associated with the classic fraudulent conveyance. *See Twyne's Case*, 76 Eng. Rep. 809, 810-11 n.B (1601) (listing examples of "badges" or "marks" of fraud); *see also BFP*, 511 U.S. at 540-41 (referring to the "badges of fraud"); *Heath v. Helmick*, 173 F.2d 157, 160 (9th Cir. 1949) ("The badges of fraud with relation to creditors were early marked in the English mercantile community . . . . Twyne's Case is a classic which delineates many devious devices."). The "badge" at issue in this case is, as the Bankruptcy Code phrases it, a transfer in which the debtor "received less than a reasonably equivalent value in exchange for such transfer." § 548(a)(1)(B)(i). The law infers the fraudulent intent, in other words, simply because the debtor transferred his mint condition sports car for $500 rather than $1000, even if there is no direct evidence of fraudulent intent. We must start from the proposition, therefore, that an exchange for less than reasonably equivalent value is constructively fraudulent.

### B

Here we have a proceeding by the bankruptcy trustee in a Chapter 7 case to recover assets pursuant to § 548 that a debtor's former spouse received in the dissolution of their marriage. The trustee, Batlan, claims that there is a constructively fraudulent conveyance because the debtor spouse received significantly less in the dissolution than the non-debtor spouse received. In other words, he alleges that the dissolution judgment effected a transfer for less than reasonably equivalent value. Under fraudulent conveyance law, if Batlan is correct that the values are not reasonably equivalent, then he can avoid the transfer.

The bankruptcy court analogized from *BFP* to conclude that where a transfer occurs pursuant to a non-collusive, contested divorce proceeding, it is presumed to be for "reasonably equivalent value" and therefore precludes an action by the trustee to recover the assets transferred as a constructively fraudulent conveyance. *See Batlan v. Bledsoe* (*In re Bledsoe*), 350 B.R. 513, 519 (Bankr. D. Or. 2006). This is essentially the position the majority adopts in its carefully crafted opinion. The majority emphasizes the policy implications of the trustee's theory of recovery, which would expose final state court marriage dissolution judgments to collateral attack in bankruptcy. *See* Maj. Op. at 7946-47.

Although this approach is reasonable and its policy concerns sensible, I prefer to reach the same conclusion by a different route. In particular, I worry that the majority has inadvertently interpreted *BFP* too broadly in applying it directly to marriage dissolution judgments. It is odd to presume that two values are reasonably equivalent when they are numerically far apart, but that is what the majority's opinion does. I agree with the majority that there is an analogy to be drawn between this case and *BFP*, but not the one the majority draws.

III

In *BFP*, the Supreme Court held that "a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." 511 U.S. at 545. The majority properly seeks to follow, and build upon, this holding. In doing so, however, it focuses more on the important state interest (regulating real property transfers in *BFP*, regulating divorces here) involved than on the logical underpinnings of the Supreme Court's opinion. To be sure, as the majority points out, *BFP* highlighted the traditional state interest in regulating real estate mortgage foreclosure sales without risk

of federal interference. *See* Maj. Op. at 7944-45, 7946. But the Supreme Court took account of the state interest only as a guide in construing the meaning, in the context at issue, of the statutory term "reasonably equivalent value." *See BFP*, 511 U.S. at 544 ("Federal statutes impinging upon important state interests cannot be *construed* without regard to the implications of our dual system of government" (internal quotation marks and alteration omitted) (emphasis added)).

I prefer to place the holding of *BFP* in its theoretical context. The Supreme Court emphasized that § 548(a)(1)(B)(i) always "directs an inquiry into the relationship of the value received by the debtor to the worth of the property transferred." *Id.* at 546. In the context of *BFP*, "[t]he language of [the statute] ('received less than a reasonably equivalent value in exchange') requires judicial inquiry into whether the foreclosed property was sold for a price that approximated its worth at the time of sale." *Id.* at 538-39. The Supreme Court concluded that the price obtained at a lawful real estate mortgage foreclosure sale, as opposed to the fair market value or some other measure, must be "the criterion of equivalence," *id.* at 538, between the property the debtor transfers (the foreclosed property) and the property he receives (the price obtained).

To put it another way, "[t]he [central] question" in *BFP* was: "*What is a foreclosed property worth?*" *Id.* at 547. Is it fair market value or something else? The Court acknowledged that "[a]n appraiser's reconstruction of 'fair market value' could show what similar property would be worth if it did not have to be sold within the time and manner strictures of state-prescribed foreclosure. But," crucially, "property that *must* be sold within those strictures is simply *worth less*." *Id.* at 539. If one wants to know how much a property that must be sold at foreclosure is worth, the logical place to look is the price it actually fetched at a properly conducted mortgage foreclosure sale. Thus the answer to the question, "What is foreclosed real estate worth?" is: its foreclosure sale price. In that

sense, the foreclosure procedure operates as a value discovery device; it tells us what the foreclosed property is really worth.

## IV

I have dwelled on this point because I believe it is the aspect of the *BFP* opinion that the majority has overlooked. In doing so, I fear it has weakened the "reasonably equivalent value" standard for purposes of § 548's version of a constructively fraudulent conveyance.

Nothing in *BFP* suggested that a court need not compare the property transferred with the property received and determine whether they are "reasonably equivalent." Indeed, *BFP* insisted on that inquiry. 511 U.S. at 546. But the majority's opinion, by holding that a state marriage dissolution judgment per se establishes reasonably equivalent value, suggests that the value of property transferred and the value of property received can be reasonably equivalent for purposes of § 548 even when they obviously are not. In my view, if A received significantly less in an exchange than B, we would say that A received less than reasonably equivalent value for the property he transferred to B. No state court proceeding can change this lack of equivalence. And *BFP* did not hold that it could. *BFP* merely held that, quite sensibly, property that is burdened, because foreclosed, is worth what it can be sold for in a regular, legal sale for foreclosed real estate. But if Jennifer Bledsoe received far less than Ryan Bledsoe in the divorce, neither *BFP* nor common sense compels us to conclude that what is not equal in fact is somehow equal in law.

Understood this way, we cannot directly apply the *BFP* Court's reasoning, that a mortgage foreclosure price reveals the value of foreclosed property, to state court marriage dissolution judgments without undermining the statutory language to which that case applied. This is because *BFP* understood the foreclosure as fulfilling a function that I do not believe a dissolution judgment fulfills—that is, value discovery. In this

case, for example, there is no unknown value to discover. There are dollar figures associated with what Ryan and Jennifer Bledsoe allegedly received and with the value of all of the marital assets combined.

But such realization does not mean that we must rule for the trustee. This becomes clear if one attempts the inquiry that § 548 compels: "an inquiry into the relationship of the value received by the debtor to the worth of the property transferred." *Id.* at 546. In this case, the debtor, Jennifer Bledsoe, received an award from the Oregon court judgment that dissolved her marriage to Ryan Bledsoe. That was the "property received." But what was the property transferred, and who owned it before? In a sense, the married couple once owned the entirety of the marital *res*, over which Jennifer no longer had any claim; but, of course, the married couple no longer existed after the divorce. Thus, to speak of a transfer fits uncomfortably with the reality of what happens in a divorce proceeding.

I believe it makes more sense to say that both spouses owned the property before dissolution, but that, because they were getting divorced, the dissolution judgment assigned the assets of the marital *res* to each spouse individually as the state court found to be equitable. That is to say, a dissolution judgment determines, for the first time, what each spouse owns on an individual basis. Therefore, the debtor ex-spouse does not transfer or receive anything, because there is no transfer for fraudulent conveyance purposes. A divorce court simply determines that, in equity, each ex-spouse owns a certain share of the marital *res*.[1]

---

[1]This is consistent with the definition, under Oregon law, of a dissolution judgment as "a partitioning of jointly owned property." Or. Rev. Stat. § 107.105(1)(f). In other words, the married spouses jointly owned the whole, but after divorce individually own only a part. *See id.* ("Subsequent to the filing of a petition for annulment or dissolution of marriage or separation, the rights of the parties in the marital assets shall be considered a

Thus the real analogy to *BFP* is that a marriage dissolution judgment, like a mortgage foreclosure sale, discovers a piece of information crucial to the inquiry, though not the same piece. Foreclosure sales discover the value of property; dissolution judgments discover, or assign, the individual ownership of property. This is the meaning of the otherwise cryptic remark by our Bankruptcy Appellate Panel in *Roosevelt v. Ray* (*In re Roosevelt*), cited by the parties in this case, that "[w]hen viewed from the perspective of the debtor-creditor relationship, it is appropriate to perceive the dissolving spouses as mutual creditor-debtors, because the law requires a fair and equitable settlement of their claims against the marital *res* and one another." 176 B.R. 200, 207 (9th Cir. BAP 1994).

In other words, as one half of a married couple, each individual spouse held a bundle of assets and liabilities, including claims against the marital *res* (e.g., wages contributed to the marital household) and against the other spouse (e.g., loans from one spouse to the other for some individual purpose). Even before divorce, one might have sorted out the bundles so that they "netted out" to yield a hypothetical balance, but no one ever needed to do so. That is precisely the task, however, of the divorce court, which "assigns assets to the appropriate spouse and makes a correlative assignment of property of equal value to the other," after "settlement of [each

---

species of coownership, and a transfer of marital assets under a judgment of annulment or dissolution of marriage or of separation . . . shall be considered a partitioning of jointly owned property."). Because the partition is equitable and therefore not always 50/50, *see id.*, it is unclear ex ante how much each spouse owns individually. The dissolution judgment answers that question.

Of course, the fact that Oregon describes the process as a transfer does not control the definition of the term "transfer" under federal bankruptcy law. *See Barnhill v. Johnson*, 503 U.S. 393, 397 (1992) (internal quotation marks omitted).

spouse's] claims against the marital *res* and one another." *Id.*[2] Thus, its dissolution judgment simply determines the entitlements to property that already existed but were unclear because there was never a need to settle conclusively who owned what.[3] That is what I mean when I characterize the dissolution judgment as a device for discovering the ownership of property, not its value. Nothing is transferred; rather, individual ownership is clarified.[4]

I recognize that excluding dissolution judgments from the reach of § 548 on the ground that they do not effect transfers

---

[2]I presume that the Bankruptcy Appellate Panel in *In re Roosevelt* used the phrase "equal value," because under California law, which governed the dispute in that case, community property typically must be divided equally in the event of dissolution. *See* Cal. Fam. Code § 2550. I discuss the implications of the California rule *infra*, at note 4.

[3]I also note that my interpretation is consistent with the effect, if not the exact language, of the Internal Revenue Code, which treats "transfers [between former spouses] incident to [a] divorce" as non-taxable events. 26 U.S.C. § 1041(a). Contrast how the Internal Revenue Code would have treated the transaction at issue in *BFP*, in which the debtor gave up the foreclosed property in exchange for cancellation of some of his debts. "Income from discharge of indebtedness" is explicitly listed in the definition of "gross income" and its receipt is, generally, a taxable event. 26 U.S.C. § 61(a)(12).

[4]The distinction I draw between establishing ownership and value may have, admittedly, little practical effect in those community property states, such as California, which mandate an equal division of community assets at divorce. *See supra*, at note 2. This is because where all dissolutions divide community property equally anyway, it does not matter whether there has been a transfer or not for purposes of fraudulent conveyance law. Even if there were a transfer, it would always be for reasonably equivalent —indeed, equal—value.

However, the distinction I draw does matter in the vast majority of states, in which the divorce court equitably divides the property, because in those states the division can often be unequal. This description covers all non-community property states, such as Oregon, and those community property states in which the law does not mandate a 50/50 division, such as Washington. *See, e.g.*, Or. Rev. Stat.§ 107.105(1)(f); Wash. Rev. Code § 26.09.080.

seems at odds with the broad definition of transfer under the
Bankruptcy Code. *See* 11 U.S.C. § 101(54)(D) ("The term
'transfer' means . . . each mode, direct or indirect, absolute or
conditional, voluntary or involuntary, of disposing of or part-
ing with (i) property; or (ii) an interest in property.").[5] In my
view, however, each spouse has not parted with any interest
in property because neither owned the marital *res* as an indi-
vidual. To the extent each spouse had an individual interest in
the marital property, it was uncertain; the dissolution judg-
ment clarifies the extent of the property interest, but does not
effect a "parting with" such interest.[6]

Furthermore, it is a cardinal principle—the so-called "*But-
ner* principle"—that bankruptcy law takes applicable non-
bankruptcy law as it finds it, particularly when it comes to the
definition of property interests. *See BFP*, 511 U.S. at 544-45
(noting that, except where a contrary purpose is "clear and
manifest," "the Bankruptcy Code will be construed to adopt,
rather than to displace, pre-existing state law" (internal quota-
tions and citation omitted)); *Butner v. United States*, 440 U.S.
48, 55 (1979) ("Property interests are created and defined by
state law . . . . Uniform treatment of property interests by both

---

[5]The majority argues that we should not reach whether the dissolution
judgment is a transfer because we do not reach issues that the parties have
not briefed. That is the usual rule, of course, but there is an exception
when "the issue presented is purely one of law and the opposing party will
suffer no prejudice as a result of the failure to raise the issue." *United
States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990). Whether a disso-
lution judgment is a transfer is a legal question that requires no factual
development here. Furthermore, the fact that the parties assumed the dis-
solution judgment was a transfer shows that they considered it. Thus nei-
ther is prejudiced by reevaluating the issue.

[6]I recognize my interpretation is in tension with our interpretation of the
Bankruptcy Act (the predecessor to the modern Bankruptcy Code) in *Britt
v. Damson*, 334 F.2d 896 (9th Cir. 1964). *Britt* held, with little analysis,
that a dissolution judgment awarding more than fifty percent of marital
property to one spouse effects a transfer to the extent of the overage. *Id.*
at 902. I believe *Britt* was wrongly decided, and therefore concur spe-
cially.

state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy." (internal quotation marks and citation omitted)).

As I pointed out above, in *BFP* the Supreme Court interpreted the term "reasonably equivalent value" in such a way as to avoid upsetting an official state legal procedure. *BFP* is not the only time the Court has favored such an approach. *See, e.g.*, *Kelly v. Robinson*, 479 U.S. 36, 50 (1986) (expressing "serious doubts whether Congress intended to make criminal penalties 'debts' within the meaning of [the Bankruptcy Code]" and then holding on related grounds that restitution obligations imposed as conditions of probation in state criminal proceedings are nondischargeable in any event); *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 502-05 (1986) (concluding that a trustee's § 554(a) abandonment power is limited by state health and safety requirements).

Furthermore, the characterization I recommend *would not* insulate from collateral attack a divorce settlement agreement, adopted by a state court, that the spouses negotiated between themselves in order to divide their assets. My reasoning, that a dissolution judgment, reached after a contested divorce proceeding, operates as a determination of the individual ownership of the former spouses without any transfer having taken place, plainly does not apply to a dissolution settlement agreement. For in that case the state court has not determined ownership, but simply ratified the parties' allocation of assets. When the parties allocate the assets, the transaction *is* akin to a contractual exchange, in which each gives up something to get something. *See In re Marriage of Lynch-Kirby*, 185 P.3d 494, 496-97 (Or. Ct. App. 2008).[7] Indeed, our court has

---

[7]The same, it seems to me, would be true of a secret, collusive agreement whereby the parties trick a court into issuing a particular dissolution judgment.

recently come to a similar conclusion with respect to a collusive marriage dissolution settlement agreement. *See Wolkowitz v. Beverly* (*In re Beverly*), 374 B.R. 221, 233-35 (9th Cir. BAP 2007) (characterizing as a transfer, in the context of § 544, a transaction in which one spouse received, pursuant to a dissolution settlement agreement, more than she otherwise would have in a judicial division), *adopted by* 551 F.3d 1092 (9th Cir. 2008).

V

Perhaps it seems overly technical to insist on the proper doctrinal approach in this case. After all, I agree with the judgment of the Court, and the majority has crafted a sensible and judicious opinion. I might not worry about a seemingly minor over-reading of *BFP* if it did not have the potential for trouble further down the line. But such potential does exist. In my view, we must guard against transforming *BFP* into a presumption that all transfers are for reasonably equivalent value simply because they occur pursuant to a regulated state procedure. We should rest our analysis as closely as possible on the reasoning of *BFP* and on a clear understanding of the nature of the specific state court judgment at issue. Practically, I fear that the majority's approach might insulate from attack as constructively fraudulent those conveyances in which, although they occur pursuant to a state procedure, the debtor clearly receives less than reasonably equivalent value in exchange for the property transferred. With respect to the Court's disposition of § 548 claim, therefore, I concur in the result only.

**United States Court of Appeals for the Ninth Circuit**
**Office of the Clerk**
95 Seventh Street; San Francisco, California 94103

**General Information**
**Judgment and Post-Judgment Proceedings**

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue seven calendar days after the expiration of the time for filing a petition for rehearing or seven calendar days from the denial of a petition for rehearing, unless the court directs otherwise. To file a motion for stay of mandate, file it electronically via the appellate ECF system or by paper with an original and four copies of the motion.

**Petition for Panel Rehearing (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -4)**
(1)    A.    **Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ‣ A material point of fact or law was overlooked in the decision;
  - ‣ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ‣ An apparent conflict with another decision of the court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

   B.    **Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:
  - ‣ Consideration by the full court is necessary to secure or maintain uniformity of the court's decisions; or
  - ‣ The proceeding involves a question of exceptional importance; or
  - ‣ The opinion directly conflicts with an existing opinion by another

court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)  Deadlines for Filing:**

▸  A petition for rehearing may be filed within fourteen (14) days after entry of judgment. Fed. R. App. P. 40(a)(1).

▸  If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(a)(1).

▸  If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.

▸  *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).

▸  An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-2.

**(3)  Statement of Counsel**

•  A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4)  Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**

•  The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.

•  The petition must be accompanied by a copy of the panel's decision being challenged.

•  An answer, when ordered by the Court, shall comply with the same length limitations as the petition.

•  If an unrepresented litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

•  The petition or answer must be accompanied by a Certificate of Compliance found at Form 11.

- If a petition is filed electronically via the appellate ECF system, no paper copies are required.
- If filing a petition for panel rehearing by paper, submit an original and 3 copies.
- If filing a petition for rehearing en banc by paper, submit an original and 50 copies.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information.

**Attorney's Fees**
- Circuit Rule 39-1 describes the content and due dates for attorney fee applications.
- All relevant forms are available on our website www.ca9.uscourts.gov or by telephoning (415) 355-7806.

**Petition for Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourtus.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - West Publishing Company; 610 Opperman Drive; PO Box 64526; St. Paul, MN 55164-0526 (Attn: Kathy Blesener, Senior Editor);
  - and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court."

Post Judgment Form - Rev. 1/2009

**Form 10. Bill of Costs** ...................................................................................................................*(Rev. 1-1-05)*

## United States Court of Appeals for the Ninth Circuit

## <u>BILL OF COSTS</u>

**<u>Note:</u>**  If you wish to file a bill of costs, it MUST be submitted on this form and filed, with the clerk, with proof of service, within 14 days of the date of entry of judgment, and in accordance with 9th Circuit Rule 39-1. A late bill of costs must be accompanied by a motion showing good cause. Please refer to FRAP 39, 28 U.S.C. § 1920, and 9th Circuit Rule 39-1 when preparing your bill of costs.

|  | v. |  | 9th Cir. No. |  |

The Clerk is requested to tax the following costs against:

| Cost Taxable under FRAP 39, 28 U.S.C. § 1920, 9th Cir. R. 39-1 | REQUESTED Each Column Must Be Completed | | | | ALLOWED To Be Completed by the Clerk | | | |
|---|---|---|---|---|---|---|---|---|
|  | No. of Docs.* | Pages per Doc. | Cost per Page** | TOTAL COST | No. of Docs.* | Pages per Doc. | Cost per Page** | TOTAL COST |
| Excerpt of Record |  |  | $ | $ |  |  | $ | $ |
| Opening Brief |  |  | $ | $ |  |  | $ | $ |
| Answering Brief |  |  | $ | $ |  |  | $ | $ |
| Reply Brief |  |  | $ | $ |  |  | $ | $ |
| Other |  |  | $ | $ |  |  | $ | $ |
|  |  |  | TOTAL: | $ |  |  | TOTAL: | $ |

**Form 10. Bill of Costs -** *Continued*

**Other:**  Any other requests must be accompanied by a statement explaining why the item(s) should be taxed pursuant to Circuit Rule 39-1. Additional items without such supporting statements will not be considered.

Attorneys fees **cannot** be requested on this form.

\* If more than 7 excerpts or 20 briefs are requested, a statement explaining the excess number must be submitted.

\*\* Costs per page may not exceed .10 or actual cost, whichever is less. Circuit Rule 39-1.

---

I, [＿＿＿＿＿＿＿＿＿＿＿＿], swear under penalty of perjury that the services for which costs are taxed were actually and necessarily performed, and that the requested costs were actually expended as listed.

Signature [＿＿＿＿＿＿＿＿＿＿＿＿]

Date [＿＿＿＿＿＿＿]

Name of Counsel: [＿＿＿＿＿＿＿＿＿＿＿]

Attorney for: [＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿]

---

(To Be Completed by the Clerk)

Date [＿＿＿＿＿＿＿＿]  Costs are taxed in the amount of $ [＿＿＿＿＿＿]

     Clerk of Court

     By: [＿＿＿＿＿＿＿＿＿＿] , Deputy Clerk